**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
          idiaz@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIEL BROOKS and NORA BOROWSKY, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CVS HEALTH CORPORATION and CVS PHARMACY, INC., | |
| Defendants. | |

Plaintiffs Ariel Brooks and Nora Borowsky ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge, against Defendants CVS Health Corporation and CVS Pharmacy, Inc. ("CVS" or "Defendants").

## NATURE OF THE ACTION

1.     This is a class action suit brought against Defendants for aiding, agreeing with, employing, or otherwise enabling the wiretapping of the electronic communications of visitors to its CVS Pharmacy mobile application, which is offered on both iOS and Android devices (the "Application").[1]

2.     Defendants contract with a third party, Quantum Metric, Inc. ("QM") to provide an analytical software-as-a-service ("SaaS") on the Application.  Through its SaaS, QM reads and learns the contents of Application users' communications with Defendant, including users' Personally Identifiable Information ("PII"), such as users' prescription and over-the-counter medications. By doing so, Defendants violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 632.

3.     Plaintiffs bring this action on behalf of themselves and a Class of all persons who used Defendants' Application in California while signed into their CVS Pharmacy account, and whose electronic communications were intercepted or recorded by QM.

## THE PARTIES

4.     Plaintiff Ariel Brooks is a resident of Oakland, California and has an intent to remain there, and is therefore a citizen of California. In or about October 2024, prior to the filing of this lawsuit, Plaintiff Brooks used the Application to browse over-the-counter medications, and refill her prescription medications. Plaintiff Brooks accessed the Application on her Android device in the state of California and while signed into her CVS Pharmacy account. Plaintiff Brooks has been accessing her account on the Application since at least February 2024. During the October visit,

---

[1] The Application shall refer to both the iOS and Android versions, unless otherwise specified.

Defendants enabled QM to intercept Plaintiff Brooks' electronic communications with CVS in real-time, including but not limited to, her first and last name, email address, physical address, medications, and products that she viewed. Plaintiff Brooks was unaware at the time that her electronic communications, including the information described above, were being intercepted in real-time and disclosed to QM, nor did Plaintiff Brooks consent to the same.

5.      Plaintiff Nora Borowsky is a resident of Novato, California and has an intent to remain there, and is therefore a citizen of California. In or about November 2024, prior to the filing of this lawsuit, Plaintiff Borowsky used the Application to browse over-the-counter medications and refill her prescription medications. Plaintiff Borowsky has accessed the Application on her iOS device in the state of California while signed into her CVS Pharmacy account for approximately 5 years prior to November 2024. During the November visit, Defendants enabled QM to intercept Plaintiff Borowsky's electronic communications with CVS in real-time—including but not limited to, her first name, last name, address, email address, and medications. Plaintiff Borowsky was unaware at the time that her electronic communications, including the information described above, were being intercepted in real-time and disclosed to QM, nor did Plaintiff Borowsky consent to the same.

6.      Defendant CVS Health Corporation is a Delaware corporation, with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.

7.      Defendant CVS Pharmacy, Inc. is a subsidiary of Defendant CVS Health Corporation, with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from at least one Defendant.

9.      This Court has personal jurisdiction over Defendants.  Defendants maintain dozens of locations in California,[2] where Defendants provide pharmacy services and sell over-the-counter

---

[2] CVS Stores in California, https://www.cvs.com/store-locator/cvs-pharmacy-locations/California.

products.  Naturally, Defendants derive substantial revenue from the products and services they sell and provide in California.  Further, the Application is a method through which Californians purchase products and refill prescriptions at these CVS locations.  For instance, a consumer may refill a prescription on the Application (as Plaintiffs did here), and that request is sent to the consumer's local CVS in California, whereupon Defendants fill the prescription and deliver it to the consumer.  Thus, Defendants "operate[] an interactive [mobile application] which is integrated with retail outlets in California, therefore [CVS] is carrying on part of its general business in California by marshaling the market via its [mobile application]."  *Kauffman v. Papa John's Int'l, Inc.*, 2024 WL 171363, at *4 (S.D. Cal. Jan. 12, 2024).  Accordingly, Defendants have purposefully availed themselves of the privilege of doing business in California.  In addition, Plaintiffs' claims relate to Defendants' California activities as Plaintiffs were wiretapped when filling their prescriptions or browsing products, which Defendants would fill, ship, or otherwise provide through their in-state locations.  Finally, Defendants also consented to personal jurisdiction in California because, at all times material to this action, Defendants were registered to do business in California and appointed a registered agent for service of process in California.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## STATEMENT OF FACTS

### I.     OVERVIEW OF QM'S SERVICES

11.     QM provides a software-as-a-service platform of the same name to customers across the country, including Defendants.

12.     QM's service includes many features such as data analytics, AI analysis, and session replay.  Each of these features is employed by CVS on the Application and is discussed in turn.

#### A.     Session Replay

13.     Most relevant to this action is QM's "Session Replay" function. As QM describes Session Replay on its website:

> Session replay is the reproduction of a user's interactions on web or native mobile applications. Session replay captures things like mouse movements, clicks, typing, scrolling, swiping, tapping, etc. Session replay isn't a recording of a user's session. It's a

reproduction of the individual experience based on the changing state of their browser or application, with all of the underlying contextual user data.[3]

14.    QM's patented "capture method" "provides the ability to capture any native application screen or view and translate those components into familiar DOM counterparts to render them in our replay engine."[4]

15.    In more technical terms, a crucial component of every website is the Document Object Model ("DOM"), which "is the data representation of the objects that comprise the structure and content of a document on the web."[5] In other words, the DOM is part of the foundation of any given website or application.

16.    When a user interacts with an application—such as by clicking on particular item of interest or entering text into a search bar—the DOM is altered. Session replay services like QM's "log[] every change made to the DOM, such as users entering or retrieving information, as an event. [They] then string[] these events together into a representation of each user's individual session."[6]

17.    After capturing the event data (*e.g.*, items clicked or text entered), session replay services like QM's compile this information into a "video recording" of the user's visit to the website. As a result, companies can "can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app."[7]

//

//

//

//

//

---

[3] https://www.quantummetric.com/platform/session-replay/.

[4] https://www.quantummetric.com/platform/mobile-app-analytics.

[5] https://developer.mozilla.org/en-US/docs/Web/API/Document_Object_Model/Introduction.

[6] https://www.datadoghq.com/knowledge-center/session-replay/.

[7] https://www.quantummetric.com/enterprise-guide-to-session-replay/#h1.



18.     The word "replay" is also a bit of a misnomer. The changes to the DOM (*i.e.*, the user's interactions with the website) are captured and transmitted to the session replay provider (*i.e.*, QM) "at hyper-frequent intervals, often just milliseconds apart." *See India Price v. Carnival Corp.*, 712 F.Supp.3d 1347, 1360 (S.D. Cal. Jan. 19, 2024). Thus, the capturing and reading of user information occurs in real time and contemporaneously with the communication.

19.     QM's patent is illustrative of this contemporaneous interception. When a user communicates with a website (in the form of interactions like clicking items of interest or entering search terms), that information is transmitted to a web server. But, along the way, the "server-side capture engine" (QM's service) intercepts those communications. QM's service also captures communications being sent back from the website to the user[8]:

---

[8] *Accurate And Efficient Recording Of User Experience, GUI Changes And User Interaction Events On A Remote Web Document*, U.S. Patent No. 10,146,752, at fig. 1 (issued Dec. 4, 2018)



20.     Because QM's session replay service operates in the same manner as alleged above, QM's session replay service suffers from the same privacy flaws as its competitors. As an article from the Center for Information Technology Policy at Princeton University found:

> the extent of data collected by these services far exceeds user expectations … text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user.   This data can't reasonably be expected to be kept anonymous.[9]

21.     As the article goes on to note, "[c]ollection of page content by third-party replay scripts may cause *sensitive information such as medical conditions*, credit card details and other personal information displayed on a page to leak to the third-party as part of the recording," which "may expose users to identity theft, online scams, and other unwanted behavior."[10]

22.     Sensitive user information may be leaked for a multitude of reasons, including but not

---

[9] https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[10] *Id.* (emphasis added).

limited to the fact that (i) "[a]utomated redaction is imperfect; fields are redacted by input element type or heuristics, which may not always match the implementation used by publishers (*e.g.*, information may be redacted when a form field auto-completes, but not when it is manually entered); (ii) page content may not be redacted, even if user inputs are; and (iii) websites operators must manually configure and label personal information to be redacted, which does not always occur."[11]

23.    QM is no exception to this.  Each mobile app operator must manually select whether information should be captured, not captured, or encrypted.[12]  This is an imperfect process.  For instance, and as alleged in more detail below, on Defendants' Application, consumer PII and the full names of prescription medications are captured unencrypted by QM alongside other information, despite QM's claim that it allegedly "separately encrypt[s]" user PII and "separate[s] any PII data that can be used to re-identify a user, from any analytical data collected."[13]

24.    In other words, contrary to its alleged promises, QM is intercepted user PII and medical information *unencrypted* and *alongside other information allowing identification*.  This is caused by Defendants' configuration and implementation of QM's service.

25.    In addition to capturing PII and medical information, QM's Session Replay feature captures other identifiers, including a user's IP address:



26.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

---

[11] *Id.*

[12] https://www.quantummetric.com/platform/data-privacy-security/.

[13] https://www.quantummetric.com/platform/data-privacy-security.

27.    Through an IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[14]

28.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[15] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[16]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[17] because "[c]ompanies can use an IP address … to personally identify individuals."[18]

29.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[19]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[20]

30.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads

---

[14] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[15] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[16] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[17] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[18] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[19] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[20] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

1    to specific households or businesses based on their location."[21]

2        31.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This

3    means that advertisers can deliver highly targeted ads to specific households or businesses, rather

4    than relying on more general demographics or behavioral data."[22]

5        32.    In addition to "reach[ing] their target audience with greater precision," businesses are

6    incentivized to use a customer's public IP address because it "can be more cost-effective than other

7    forms of advertising."[23]  "By targeting specific households or businesses, businesses can avoid

8    wasting money on ads that are unlikely to be seen by their target audience."[24]

9        33.    In addition, "IP address targeting can help businesses to improve their overall

10   marketing strategy."[25]  "By analyzing data on which households or businesses are responding to their

11   ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[26]

12       34.    For these reasons, under Europe's General Data Protection Regulation, IP addresses

13   are considered "personal data, as they can potentially be used to identify an individual."[27]

14       **B.    Data Analytics, AI, And Partner Integrations**

15       35.    Beyond capturing and reading a user's personal information, QM also has the

16   capability to analyze the captured information with a sophisticated suite of services—including AI—

17   and further disclose captured user information to other third parties.[28]:

18

19   _____

20   [21] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj
     0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV
     5-5maUaAgtNEALw_wcB.

21   [22] *Id.*

22   [23] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29,
     2023),    https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-
23   williams-z7bhf.

24   [24] *Id.*

25   [25] *Id.*

26   [26] *Id.*

     [27] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-
     an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION,
27   https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

28   [28] https://www.quantummetric.com/platform/mobile-app-analytics.



36.    QM further advertises that it "will start capturing data out of the box. More than just app crashes – capture behavioral indicators, conversion data points, API performance, and more," as shown on their website[29]:

37.    QM provides its partners, like CVS, with analytics, including behavioral metrics, technical metrics, and business metrics. Defendant also collects "over 300 audience dimensions such as browser, device type, and location."[30]

38.    The behavioral metrics Defendant collects includes "clicks, taps, scrolls, long running spinners, scroll depth, form submits, back button usage, page views, typed text, frustration signals, and more."[31]

39.    QM's website touts its autocapture feature, telling customers to "leverage the power of Quantum Metric's autocapture for every user interaction – swipe, click, scroll, API response, page

---

[29]*Id.*

[30] https://www.quantummetric.com/platform/data-capture-and-activation/

[31] *Id.*

1  view, and more – to enhance and improve its understanding of your data."[32]

2  40.    Moreover, QM's Feliz AI tool has the capacity to "automatically summarize the

3  thousands of data points collected in a user session and consolidates the session timeline into a short,

4  readable summary."[33]

5  41.    QM's services also utilize the assistance of third parties, including but not limited to,

6  Google Analytics, Adobe Analytics, Salesforce, AppDynamics, and more.[34]  QM thus shares users'

7  information with these third parties.

8  42.    For example, QM's website explains customers can "enrich Google Analytics with

9  digital experience metrics and deep links into the Quantum Metric platform."[35]  This allows

10  customers to receive "enhanced learning" including "a complete overview of every user session."[36]

11  QM provides the same explanation for its use of Adobe Analytics.[37]

12  43.    QM's customers, like Defendants, incorporate these services into their mobile

13  applications.

14  44.    Because QM has the capability to "capture[], store[], and interpret[] [] real-time data,"

15  it is not like a tape recorder or "tool" used by one party to record another. *See Yoon v. Lululemon*

16  *USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021) (finding plaintiff sufficiently alleged QM

17  was akin to "an eavesdropper standing outside the door").  Instead, QM—a separate and distinct

18  third-party entity from the parties to the conversation (Plaintiffs and Class Members, on the one hand,

19  and CVS, on the other)—eavesdrops upon, records, extract data from, and analyzes a conversation

20  to which it was not a party.  This is because QM itself is collecting the content of any conversation.

21  That data is then analyzed by QM in the manner alleged above before being provided to any entity

22  that was a party to the conversation (like CVS).

23  _____

24  [32] https://www.quantummetric.com/platform/platform-intelligence/

     [33] *Id.*

25  [34] https://www.quantummetric.com/partners/partner-network/#technology,customer-experience,
26  performance-monitoring,marketing-analysis,experimentation.

     [35] https://www.quantummetric.com/partners/integration-google-analytics/
27  [36] *Id.*

28  [37] https://www.quantummetric.com/partners/integration-adobe-analytics/

_____

45.    QM business model involves providing the services outlined above for a fee to mobile



app developers.  One of QM's featured clients is CVS:

46.    QM operates on Defendants' Application in the manner described above. Thus, on CVS's Application, QM captures website users' electronic communications in real-time through its Session Replay feature, and then has the capability to analyze those communications and divulge them to other third parties.

47.    QM's begins intercepting user information as soon as a user accesses the Application. Thus, users are not on notice of QM's wiretapping, nor do users provide their consent to the same.

**II.    DEFENDANTS ENABLED QM'S WIRETAPPING OF PLAINTIFFS' ELECTRONIC COMMUNICATIONS**

48.    In October 2024, Plaintiffs' counsel retained a private research company to review and conduct a dynamic analysis on the Application.  A "dynamic analysis" records the transmissions that occur from a user's device.

49.    The private researchers tested what information (if any) is transmitted to third parties when a user accesses and uses the CVS Application, including when a user is signed into their pharmacy account and refills a prescription and/or purchases or looks at over-the-counter products.

50.    The researchers found that on both the Android and iOS mobile applications, when a user is signed into their CVS account, QM—as enabled by CVS—intercepts sensitive medical information alongside PII, allowing QM to identify which individuals are receiving which specific medical treatments.

51.    For instance, just when shopping for over-the-counter products, QM intercepts an iOS Application user's first name, e-mail address, the medication they viewed, and their vaccination history when the user is signed into a CVS pharmacy account:

| THIRD PARTY | PRODUCT INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| Quantum Metric | Vaccination History, Viewed Medication | Email, First Name | - |

52.     In addition, when an Android Application user goes to refill a medication or views their prescription history, QM intercepts their full name, e-mail address, phone number, shipping address, the medication they viewed, their vaccination history, and even the address of the store they fill their prescriptions at:

| THIRD PARTY | PRODUCT INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| Quantum Metric | Store Address, Product Name, Product Price, Product Quantity, Vaccination History, Viewed Medication | Email, Phone Number, First Name, Last Name, Shipping Address | - |

53.     Crucially, none of this information is encrypted by QM (although it has been redacted by Plaintiffs in the screenshots below to protect the user's privacy).  For instance, in the below screenshot from the dynamic analysis of the Android Application, the user's phone number (redacted by Plaintiffs to XXX-XXX-XXXX) and e-mail address (redacted by Plaintiffs to j[redacted for privacy]@duck.com) were intercepted by QM:

```
id=\"q114397790\" data-c=\"EmptyMeasurePolicy\" data-id=\"j[redacted for privacy]@duck.com\"><div
style=\"--w:380;--h:20;top:8px;\" id=\"q114397790-1\"><div
style=\"--h:348;--h:20;left:16px;overflow:hidden;\" id=\"q114397790-2\"><div
style=\"color:rgb(26,26,25);--fs:15.0;\" class=\"t\" id=\"q114397790-text\"><span class=\"tat
tal\">j[redacted for privacy]@duck.com</span><\/div><\/div><\/div><div
style=\"--w:380;--h:20;top:191px;\" id=\"q223980300\" data-c=\"EmptyMeasurePolicy\"
data-id=\"XXX-XXX-XXXX[redacted for privacy]\"><div
style=\"--h:348;--h:20;left:16px;overflow:hidden;\" id=\"q223980300-1\"><div
style=\"color:rgb(26,26,25);--fs:15.0;\" class=\"t\" id=\"q223980300-text\"><span class=\"tat
tal\">XXX-XXX-XXXX[redacted for privacy]\<\/span><\/div><\/div><\/div><div style=\"--w:0;--h:0;\"
id=\"q69236330\" data-c=\"SpacerMeasurePolicy\"><\/div><div style=\"--w:380;--h:15;top:228px;\"
```

54.     In another portion of the same transmission, the user's full name (redacted by Plaintiffs to J[redacted for privacy]) is listed right next to their filled medication, Escitalopram, which is the generic for Lexapro, an anti-depressant:

```
data-id=\"Activate to view Prescription details\"><div style=\"--w:347;--h:160;\" id=\"q60106381\" data-c=\"0)))\"
class=\"p\" data-id=\"ESCITALOPRAM 10 MG TABLET J[redacted for privacy] Last filled Aug 15, 2023 3 fills left Requires
Renewal Once you place your order, we'll reach out to your prescriber for a new prescription. Your request may take a few
days.\"><div style=\"--w:347;--h:61;\" id=\"q76240823\" data-c=\"0)))\" class=\"p\"><div style=\"--w:347;--h:31;\"
```

55.     And in yet another portion of the same transmission, the user's full name is listed right next to the user's vaccination history:

```
data-id=\"Activate to view Prescription details\"><div style=\"--w:347;--h:91;\" id=\"q212402902\"
data-c=\"0)))\" class=\"p\" data-id=\"MODERNA COVID-19 BIVALENT J[redacted for privacy] Last filled
Oct 07, 2022 0 fills left Prescription not eligible for renewal \"><div style=\"--w:347;--h:61;\"
```

56.    QM's wiretapping of Plaintiffs' and Class members' electronic communications began the moment they accessed the Application and happened in real time.  Further, the information QM intercepts is the result of a user interacting with the Application (*e.g.*, filling prescriptions, clicking on items of interest, typing in products into the search field) rather than automatically generated.  Thus, QM is intercepting the "contents" of users' affirmative communications with the Application.

57.    Neither CVS nor QM asked Plaintiffs whether they consented to being wiretapped by QM. Plaintiffs were never explicitly told that their electronic communications were being wiretapped by QM, nor did CVS or QM obtain Plaintiffs' prior consent to the wiretapping.

58.    Plaintiffs were in California when they accessed the Application through their mobile phones. Upon Plaintiffs accessing the Application in California, QM's service instructed the browser in California to send electronic communications directly to it from the California location of the browser to QM's servers.

59.    QM had access to Plaintiffs' and Class Members' communications because QM contracted with Defendants to provide its services on the Application.

60.    Defendants' enabling of QM's wiretapping of consumer PII and medical information is a massive breach of consumer privacy.  In December 2022, the Department of Health and Human Services published guidance on the use of tracking technologies by HIPAA-covered entities, such as Defendants.[38]  Although that guidance was vacated by a decision out of the Northern District of Texas, its admonitions regarding the privacy harm to consumers bear discussion.

61.    As HHS noted, "[t]racking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications."  These include "session replay scripts," and HHS notes many such tracking technologies "are not apparent to the

---

[38] USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

website or mobile app user." HHS stated that "[s]ome regulated entities may share sensitive information with tracking technology vendors and such sharing may involve unauthorized disclosures of PHI with such vendors. *Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules*."[39]

62. As HHS noted:

> [a]n impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[40]

63. Defendants' employment of QM's tracking technology violates HHS's former guidance. As HHS notes:

> [m]obile apps that regulated entities offer to individuals … collect a variety of information provided by the app user, including information typed or uploaded into the app, as well as information provided by the app user's device, such as fingerprints, network location, geolocation, device ID, or advertising ID. Such information collected by a regulated entity's mobile app generally is PHI and the regulated entity must comply with the HIPAA Rules for any PHI that the mobile app uses or discloses, including any subsequent disclosures to the mobile app vendor, tracking technology vendor, or any other third party who receives such information.
>
> For example, a patient might use a health clinic's diabetes management mobile app to track health information such as glucose levels and insulin doses. *In this example, the transmission of information to a tracking technology vendor as a result of using such app would be a disclosure of PHI because the individual's use of the app is related to an individual's health condition (i.e., diabetes) and that, together with any individually identifying information (e.g., name, mobile number, IP address, device ID), meets the definition of IIHI.*[41]

---

[39] *Id.* (emphasis added).

[40] *Id.*

[41] *Id.* (emphasis added).

64.     This is the exact situation here, where QM—as enabled by CVS—intercepts a user's full name, e-mail address, and phone number, alongside their medication and vaccination history.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff Brooks seeks to represent a class of all California residents who used Defendants' Application while in California and on an Android device while signed into their CVS Pharmacy account and whose electronic communications were intercepted or recorded by QM (the "Android Class").

66.     Plaintiff Borowsky seeks to represent a class of all California residents who used Defendants' Application while in California and on an iOS device while signed into their CVS Pharmacy account and whose electronic communications were intercepted or recorded by QM (the "iOS Class").

67.     The Android Class and iOS Class shall be collectively referred to as the "Class." Plaintiffs reserve the right to modify the Class definition at any time, including but not limited to through the use of subclasses.

68.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

69.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to, whether Defendants violated CIPA § 631; whether Defendants violated the CIPA § 632; and whether Class Members are entitled to actual and/or statutory damages for the aforementioned violations.

70.     The claims of the named Plaintiffs are typical of the claims of the Class because the named Plaintiffs, like all other Class Members, accessed the Application and had their electronic communications intercepted by QM through Defendants' employment of QM's services.

71.     Plaintiffs are adequate representatives of the Class because their interests do not

conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

72.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631

73.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

75.    The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

76.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end

of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

77.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (1985) (emphasis added; internal citations omitted).

78.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

79.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

80.     QM's software-as-a-service is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

81.     QM is a "separate legal entity that offers 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, QM was a third party to any communication between Plaintiffs and Class Members, on the one hand, and Defendants' Application, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *Yoon*, 549 F. Supp. 3d at 1081.

82.     At all relevant times, QM willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and Class Members on the one hand, and Defendants' Application, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

83.     At all relevant times, Defendants aided, agreed with, employed, or otherwise enabled QM to intercept consumers' communications with CVS on the Application and to accomplish the wrongful conduct at issue here.

84.     Plaintiffs and Class Members did not consent to QM's intentional access, interception, reading, learning, recording, and collection of Plaintiffs and Class Members' electronic communications. Nor did Plaintiffs and Class Members consent to Defendants aiding, agreeing with, employing, or otherwise enabling QM's conduct.

85.    Plaintiffs and Class Members were in California when they accessed the Application through their mobile phones. Upon Plaintiffs and Class Members accessing the Application in California, QM's and Defendants' services instructed the browser in California to send electronic communications directly to it from the California location of the browser to QM's servers.

86.    Plaintiffs and Class Members seek all relief available under Cal. Penal Code § 637.2, including statutory damages of $5,000 per violation.

<div align="center">

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

</div>

87.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

88.    Plaintiffs brings this claim individually and on behalf of the members of the Class against Defendants.

89.    California Penal Code § 632 prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

90.    QM's software-as-a-service is an "electronic amplifying or recording device."

91.    At all times, the communications between Plaintiffs and Class Members, on the one hand, and Defendants through their Application, on the other, were confidential because the communications included medical and pharmaceutical information.

92.    At all relevant times, Defendant intentionally used QM's services to enable QM to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

93.    When communicating with Defendants through their pharmacy Application, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. Plaintiffs and Class Members did not reasonably expect that anyone other than CVS would be on the other end of the confidential communications, nor that other third-party entities like QM would eavesdrop upon and record the confidential communications of Plaintiffs and Class Members. Indeed, Plaintiffs and Class Members each communicated medical-related information to CVS, which enhanced their

reasonable expectation of privacy because such sensitive information should not be disclosed to nor intercepted by third parties like QM.

94.     Plaintiffs and Class Members did not provide their prior consent to QM's intentional access, interception, reading, learning, recording, and collection of their electronic communications.

95.     Plaintiffs and Class Members were in California when they accessed the Application through their mobile phones. Upon Plaintiffs and Class Members accessing the Application in California, QM's and Defendants' services instructed the browser in California to send electronic communications directly to it from the California location of the browser to QM's servers.

96.     Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by the violations of CIPA § 632(a), and seek statutory damages of $5,000 for each of Defendants' violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)     For an order certifying the Classes under Rule 23, naming Plaintiffs as the representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that the Defendants' conduct violates the CIPA;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e)     For pre- and post-judgment interest on all amounts awarded; and

(f)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

1    Dated: December 12, 2024                Respectfully submitted,

2                                            **BURSOR & FISHER, P.A**.

3                                            By: /s/ *Ines Diaz Villafana*
                                                     Ines Diaz Villafana
4

5                                            L. Timothy Fisher (State Bar No. 191626)
                                             Ines Diaz Villafana (State Bar No. 354099)
                                             1990 North California Blvd., 9th Floor
6                                            Walnut Creek, CA 94596
                                             Telephone: (925) 300-4455
7                                            Facsimile:  (925) 407-2700
                                             Email: ltfisher@bursor.com
8                                                     idiaz@bursor.com

9                                            *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28