**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Ines Diaz Villafana (State Bar. No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
idiaz@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARIEL BROOKS and NORA BOROWSKY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION and CVS PHARMACY, INC.,<br><br>Defendants. | Case No. 3:24-cv-08990-AMO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: September 11, 2025<br>Time: 2:00 p.m.<br>Room: Courtroom 10 – 19th Floor<br>Judge: Hon. Araceli Martínez-Olguín |

# TABLE OF CONTENTS

PAGE


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. DEFENDANTS' CHALLENGE TO STANDING RESTS ON FACTUAL DISPUTES INAPPROPRIATE FOR RESOLUTION AT THIS STAGE ..... 4

II. PLAINTIFFS ALLEGE ACTUAL AND IMMINENT CONCRETE HARM: THE LOSS OF CONTROL OF THEIR PERSONAL AND MEDICAL INFORMATION AS A RESULT OF DEFENDANTS EMPLOYING QM'S SURVEILLANCE OF APP USERS ..... 5

III. QM IS A THIRD-PARTY EAVESDROPPER ..... 8

A. CIPA § 632 Does Not Require The Presence Of A Third Party ..... 8

B. QM Is A Third-Party Eavesdropper Under The "Capability" Test, Which This Court Adopted In *Cody* ..... 9

C. The Business Association Agreement Does Not Make QM Any Less Of A Third Party Eavesdropper, And In Fact, Supports That QM Is One ..... 10

IV. DEFENDANTS HAVE NOT MET THEIR BURDEN TO SHOW PLAINTIFFS CONSENTED TO QM'S WIRETAPPING ..... 12

A. Defendants Have Not Shown That Plaintiffs Were On Notice Of Or Assented To The Privacy Policy ..... 12

1. Defendants Have Not Submitted The Design And Content Of The Webform Plaintiffs Actually Saw When They Created Their CVS Accounts ..... 13

2. The Design And Content Of Defendants' Webform Was Insufficient To Put Plaintiffs On Notice Of The Consent To The Privacy Policy ..... 13

3. There Was No Unambiguous Manifestation Of Assent To The Privacy Policy Hyperlink ..... 16

4. The "Terms Within Terms" Approach To The Privacy Policy Is Insufficient For Notice ..... 17

5. The App Store And Menu Disclosures Are Insufficient ..... 18

B. The Privacy Policy Does Not Disclose The Wiretapping, And In Fact, Could Give Reasonable Users The Opposite Impression ..... 19

C. Any Updated Terms Do Not Apply Absent Reasonably Conspicuous Notice And Assent To The Same ..... 21

V. PLAINTIFFS' CONTINUED USE OF A PHARMACEUTICAL APP DOES NOT PRECLUDE A FINDING OF CONCRETE HARM .......... 22

CONCLUSION .......... 24

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ajzenman v. Off. of Comm'r of Baseball*,
492 F. Supp. 3d 1067 (C.D. Cal. 2020) ........ 18

*Ambriz v. Google, LLC*,
2025 WL 830450 (N.D. Cal. Feb. 10, 2025) ........ 9, 11

*Animal Legal Def. Fund v. United States Dep't of Agric.*,
935 F.3d 858 (9th Cir. 2019) ........ 23

*Antman v. Uber Techs., Inc.*,
2018 WL 2151231 (N.D. Cal. May 10, 2018) ........ 8

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d 912 (9th Cir. 2001) ........ 4

*Augustine v. Lenovo (United States), Inc.*,
2023 WL 4938050 (S.D. Cal. Aug. 2, 2023) ........ 4

*Balletto v. Am. Honda Motor Co.*,
2024 WL 589090 (N.D. Cal. Feb. 13, 2024) ........ 9

*Benson v. Double Down Interactive, LLC*,
798 F. App'x 117 (9th Cir. 2020) ........ 16

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........ 14, 16, 17

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ........ 5, 6

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ........ 12

*Burzdak v. Universal Screen Arts, Inc.*,
2021 WL 3621830 (N.D. Cal. Aug. 16, 2021) ........ 15, 16

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ........ 12, 19, 20, 21

*Castillo v. Costco Wholesale Corp.*,
2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) ........ 3

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ........ 18

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024)....... 4, 9, 12, 18

*Colgate v. JUUL Labs, Inc.*,
402 F. Supp. 3d 728 (N.D. Cal. 2019)....... 17

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024)....... 12

*Dep't of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989)....... 5

*Douglas v. United States District Court for the Central District of California*,
495 F.3d 1062 (9th Cir. 2007)....... 21

*Fischer v. United States*,
603 U.S. 480 (2024)....... 20

*Frasco v. Flo Health, Inc.*,
2025 WL 1433825 (N.D. Cal. May 19, 2025)....... passim

*Gill v. Chipotle Mexican Grill, Inc.*,
2025 WL 287320 (C.D. Cal. Jan. 23, 2025)....... 15

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024)....... 9

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025)....... 15, 17

*Greenstein v. Noblr Reciprocal Exch.*,
585 F. Supp. 3d 1220 (N.D. Cal. 2022)....... 8

*Henning v. Luxury Brand Partners, LLC*,
2023 WL 3555998 (N.D. Cal. May 11, 2023)....... 7

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009)....... 22

*Herzog. v. Super. Ct.*,
101 Cal. App. 5th 1280 (2024)....... 15

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994)....... 23

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)....... 2, 3, 5

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019)....... 3

*In re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) .......... 22

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 13, 21

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 3, 6, 8, 22

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .......... 9

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .......... 21, 22

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) .......... 2

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......... 8, 21, 22

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 16

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .......... 12, 22, 23

*M.G. v. Therapymatch, Inc.*,
2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) .......... 7

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 19

*McGhee v. N. Am. Bancard, LLC*,
2017 WL 3118799 (S.D. Cal. July 21, 2017) .......... 18

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024) .......... 23

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 7

*Morrison v. Yippee Ent., Inc.*,
756 F. Supp. 3d 842 (S.D. Cal. 2024) .......... 15, 16

*Mort v. DeJoy*,
2023 WL 168834 (E.D. Cal. Jan. 12, 2023) .......... 13

*Mount v. Pulse Point, Inc.*,
684 F. App'x 32 (2d Cir. 2017) .......... 3

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 12, 17

*Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) .......... 12

*Ramirez v. Trusper, Inc.*,
2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) .......... 18

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 5, 6

*Rocha v. Urban Outfitters, Inc.*,
2024 WL 393486 (N.D. Cal. Feb. 1, 2024) .......... 16

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal. Jan. 3, 2024) .......... 22, 23

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 24

*Sadlock v. Walt Disney Co.*,
2023 WL 4869245 (N.D. Cal. July 31, 2023) .......... 15, 16

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024) .......... 3

*Seneca v. Homeaglow Inc.*,
2024 WL 750029 (C.D. Cal. Feb. 7, 2024) .......... 15

*Shah v. Capital One Financial Corp.*,
2025 WL 714252 (N.D. Cal. Mar. 3, 2025) .......... 7

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 23

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) .......... 21

*Sunbelt Rentals, Inc. v. Victor*,
43 F. Supp. 3d 1026 (N.D. Cal. 2014) .......... 23

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. 2025) .......... 9, 10, 11

*Tejon v. Zeus Networks, LLC*,
725 F. Supp. 3d 1351 (S.D. Fla. 2024) .......... 15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 3

*Turner v. Nuance Communications, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024) ..... 4, 8, 9, 19

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) ..... 9

*Wilson v. Redbox Automated Retail, LLC*,
448 F. Supp. 3d 873 (N.D. Ill. 2020) ..... 17

*Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
2023 WL 5837492 (S.D. Cal. Sept. 8, 2023) ..... 9

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) ..... 3, 9, 20, 23

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) ..... 24

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ..... 1, 4, 9

**STATUTES**

Cal. Civ. Code § 1798.175 ..... 7

Cal. Civ. Code § 1798.80(e) ..... 19

**RULES**

Fed. R. Evid. 106 ..... 10

**REGULATIONS**

16 C.F.R. § 313.3(a) ..... 19

45 C.F.R. § 164.504(e)(2)(i)(A) ..... 11

Plaintiffs Ariel Brooks and Nora Borowsky ("Plaintiffs") respectfully submit this Opposition to Defendants CVS Health Corporation and CVS Pharmacy, Inc. ("CVS" or "Defendants") Motion to Dismiss the Complaint (ECF No. 30).

**INTRODUCTION**

"In December 2022, the Department of Health and Human Services ["HHS"] published guidance on the use of tracking technologies by HIPAA-covered entities, such as Defendants." Compl. ¶ 60. The guidance prohibited such entities from disclosing personal health information to such technology vendors—including "session replay" providers—in an unauthorized manner, an example being if "health information such as glucose levels and insulin doses" were disclosed to a "mobile app vendor." *Id.* ¶¶ 61, 63. The reasons for this should be obvious: medical information "reveal[s] incredibly sensitive information about an individual," and "an impermissible disclosure of an individual's PHI … may result in a wide range of additional harms to the individual or others." *Id.* ¶ 62.

Defendants disobeyed this guidance, enabling a third-party software-as-a-service vendor, Quantum Metric ("QM"), to collect the unredacted, non-anonymous medications, vaccination history, and full names of users of the CVS Mobile Application (the "App" or "Application"). Compl. ¶¶ 51-55. Courts have generally held that QM is a third party eavesdropper for the purposes of the California Invasion of Privacy Act ("CIPA") because it "captures, stores, and interprets [] real-time data—which extends beyond the ordinary function of a tape recorder." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021). Plaintiffs' allegations provide no reason for the Court to deviate from this understanding, as Plaintiffs allege QM "eavesdrops upon, records, extract[s] data from, and analyzes a conversation to which it was not a party." Compl. ¶ 44; *see also id.* ¶¶ 35-43 (alleging QM's capabilities).

But aside from enabling an undisclosed third party to collect private medical information, there are at least two reasons why Defendants' conduct here is so alarming. The first is that QM's service does not need to be configured to collect such private information. Instead, it can be configured to keep that information anonymous. Compl. ¶¶ 22-24. Despite this, "Defendants' configuration and implementation of QM's service" enabled QM to "intercept[] user PII and medical

information unencrypted and alongside other information allowing identification." *Id.* ¶ 24 (cleaned up). And second, rather than disclosing these practices in its Privacy Policy that users have notice of (which users do not for the reasons explained below), Defendants instead may have given users the opposite impression: that their private health information was *not* being disclosed:

| Category of Personal Information | Category of third parties to whom we disclosed personal information | Category of third parties to whom we "Sold" or "Shared" personal information |
|---|---|---|
| Other personal information not listed above and described in California Civil Code § 1798.80(e) | • Subsidiaries and affiliates<br>• Government entities, regulators and law enforcement | N/A |
| Sensitive personal information | • Government entities, regulators and law enforcement | N/A |
| Information not listed above and related to characteristics protected under California or federal law | • Subsidiaries and affiliates<br>• Government entities, regulators and law enforcement | N/A |

Bowe Decl. Ex. F at 7; *see also* Argument § IV.B., *infra* (elaborating on argument). So, to say that Defendants violated the CIPA and Plaintiffs suffered actual and concrete harm sufficient for Article III standing should be obvious. But more problematically, Defendants *intentionally* configured QM to collect private information *QM did not have to collect*, and then *gave users the impression this data collection was not happening* in Defendants' Privacy Policy. Defendants' conduct not only violated California law and HHS guidance, it constituted an egregious breach of privacy by a company tasked with handling some of the most sensitive and revealing information that exists.

Against these facts, each of Defendants' arguments regarding Article III standing are easily disposed of. And for the following reasons, Defendants' Motion should be denied.

## ARGUMENT

As the Ninth Circuit and every other circuit court to address the question has held, "the relevant law is settled" that the interception of information on a website or mobile application in violation of a privacy like the CIPA is sufficient for Article III standing because such statutes "codif[y] a common law privacy right gives rise to a concrete injury." *Jones v. Ford Motor Co.*, 85 F.4th 570, 574 (9th Cir. 2023) (cleaned up); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d

589, 596, 599 (9th Cir. 2020) (finding plaintiffs had standing to sue for violations of CIPA and other statutes because "these statutory provisions codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing"); *Salazar v. National Basketball Association*, 118 F.4th 533, 542 (2d Cir. 2024) (finding standing where plaintiff alleged his data "was disclosed as a result of an arrangement between the NBA and Meta pursuant to which the NBA deliberately uses the Facebook Pixel") (cleaned up); *Mount v. Pulse Point, Inc.*, 684 F. App'x 32, 34-35 (2d Cir. 2017) ("PulsePoint's alleged unauthorized accessing and monitoring of plaintiffs' web-browsing activity implicates harms similar to those associated with the common law tort of intrusion upon seclusion so as to satisfy the requirement of concreteness.").

Indeed, as the Third Circuit aptly put, "[i]n an era when millions of Americans conduct their affairs increasingly through electronic devices, the assertion … that federal courts are powerless to provide a remedy when an internet company surreptitiously collects private data [] is untenable." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019). This is particularly so where, as here, Plaintiffs allege that Defendant enabled an undisclosed third party to intercept private and non-anonymous medical information. *See* Compl. ¶¶ 51-55; *see also Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 970-71 (N.D. Cal. 2023) (standing alleged where software-as-a-service provider alleged wiretapped medical information in violation of the CIPA); *Frasco v. Flo Health, Inc.*, --- F.R.D. ---, 2025 WL 1433825, at *11-12 (N.D. Cal. May 19, 2025) (same); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *12 (W.D. Wash. Nov. 14, 2024) (same where "Plaintiffs allege that Costco collected personal health data that could be linked to their identities through their Facebook accounts").

Further, none of these authorities were vacated or altered by *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). "*TransUnion* had nothing to say about the surreptitious appropriation of private … data, nor did it substantively address the tort of intrusion upon seclusion. And … *TransUnion* did not affect a sea change in the law of standing." *Frasco*, 2025 WL 1433825, at *12; *see also James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 949 (N.D. Cal. 2023) ("Nothing about *TransUnion* guts the above holding in *Facebook*, particularly because *Facebook* postdates *Spokeo*, the precedent on which

*TransUnion* largely relied. Furthermore, the Ninth Circuit has not disavowed *Facebook* in the wake of *TransUnion*.").

Against this weight of authority, Defendants contend Plaintiffs lack Article III standing to sue based on "(i) Plaintiffs' own conduct after filing the Complaint, (ii) the contemporaneous disclosures of CVS's use of the type of technology provided by QM, (iii) the contractual limitations imposed upon QM through the BAA in place with CVS, and (iv) the absence of allegations to support any harm." MTD at 12:19-22. Defendants' arguments fail.

## I. DEFENDANTS' CHALLENGE TO STANDING RESTS ON FACTUAL DISPUTES INAPPROPRIATE FOR RESOLUTION AT THIS STAGE

As an initial matter, Defendants' arguments rest on disputed questions of fact, such as whether QM is a "third party wiretapper" and whether Defendants' policies disclose the wiretapping. *See Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021) ("The question thus becomes, in analogue terms: is Quantum Metric a tape recorder held by Lululemon, or is it an eavesdropper standing outside the door? This is a question of fact for a jury, best answered after discovery into the storage mechanics of Session Replay."); *Augustine v. Lenovo (United States), Inc.*, 2023 WL 4938050, at *3 (S.D. Cal. Aug. 2, 2023) (same); *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1001 (N.D. Cal. 2024) (Martínez-Olguín, J.) (declining to dismiss CIPA claim because 'whether the privacy policy contains sufficient notice of recording … [is a] fact[] that must be developed and asserted at a later stage of litigation.'"); *Turner v. Nuance Communications, Inc.*, 735 F. Supp. 3d 1169, 1181 (N.D. Cal. 2024) (declining to dismiss CIPA claim based on consent where "there is a factual dispute over whether the DAA sufficiently notified Plaintiffs of Nuance's conduct").

Further enhancing the factual nature of Defendants' challenge, Defendants dedicate a significant portion of their Motion referencing evidence outside of the pleadings, which the Court may not consider at this juncture. See *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) ("While evidence outside the complaint indicates that Officers Stone and Barnes interviewed additional witnesses, such extraneous evidence should not be considered in ruling on a motion to dismiss.").

When, as here, "jurisdictional issues are intertwined with an element of the merits of the [P]laintiff[s'] claim, the [C]ourt must treat the motion like a motion for summary judgment and leave the resolution of material factual disputes to the trier of fact." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1143 (9th Cir. 2024) (cleaned up). Thus, the Court should not resolve Defendants' challenges to standing at this juncture, instead leaving resolution of these arguments until a fuller factual record.

**II. PLAINTIFFS ALLEGE ACTUAL AND IMMINENT CONCRETE HARM: THE LOSS OF CONTROL OF THEIR PERSONAL AND MEDICAL INFORMATION AS A RESULT OF DEFENDANTS EMPLOYING QM'S SURVEILLANCE OF APP USERS**

Defendants argue that Plaintiffs "fail to identify any actual or imminent physical, economic, or property harm," instead "assert[ing] speculative allegations of harm." MTD at 15:16-19. Defendants misunderstand both the harm Plaintiffs seek to remedy here and the harm CIPA protects against.

*First*, as the California Supreme Court has explained:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements.*

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted). In other words, the substantive privacy interest the CIPA protects is a person's right to "control [] information concerning his or her person." *In re Facebook*, 956 F.3d at 598. This privacy interest has been historically recognized by "both the common law and the literal understandings of privacy." *Dep't of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989); *see also Frasco*, 2025 WL 1433825, at *12 ("[T]he harm made actionable at common law was an individual's loss of control over her private affairs or concerns by an interloper's tortious intentional interference.") (cleaned up). Consequently, "obtaining user information in a healthcare app" "is the 'concrete

harm," as the user "has lost control over her private information because of another's intentional actions." *Frasco*, 2025 WL 1433825, at *12.

*Second*, this loss of the right to control one's personal information "is the privacy right being claimed by Plaintiffs here." *James*, 701 F. Supp. 3d at 950. Plaintiffs allege that Defendants "contracted with [QM] to provide its services on the Application," thus intentionally employing QM and enabling the wiretapping. Compl. ¶ 59; *see also id.* ¶¶ 45 (QM listing Defendants as a featured client), 60, 83. Not only that, Defendants specifically configured QM to intercept medical information in an "unencrypted [format] and alongside other information allowing identification." *Id.* ¶ 24. As a result of this intentional contract, Plaintiffs' personally identifying medical information—their names, e-mail addresses, vaccination histories, and medications—was actually, surreptitiously, and non-consensually intercepted by QM, "an unannounced second auditor." *Ribas*, 38 Cal. 3d at 360; *see also* Compl. ¶¶ 51-55, 57. Plaintiffs also allege that QM "has the capability to analyze the captured information with a sophisticated suite of services—including AI—and further disclose captured user information to other third parties." Compl. ¶ 35; *see also id.* ¶¶ 36-42 (describing these capabilities). But most salient here, Plaintiffs were lost control of their personal information—and were thus concretely harmed sufficient for Article III standing—and the moment their health information ended up in QM's hands.

*Finally*, Plaintiffs include additional allegations that the surreptitious interception of their medical information by QM puts them at risk of additional harms, such as "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the[ir] reputation, health, or physical safety." Compl. ¶ 61; *see also id.* ¶ 21 ("[C]ollection of page content by third-party replay scripts … may expose users to identity theft, online scams, and other unwanted behavior.") (cleaned up). These allegations of future harm only compound the harm Plaintiffs already suffered when they loss the right to control their personal medical information; Plaintiffs' Article III standing does not depend on them. In any event, because Plaintiffs have actually been exposed to QM's wiretapping, these risks of future harm flowing from that wiretapping are sufficiently concrete. *See Bowen*, 118 F.4th at 1149 (finding Article III standing where plaintiffs purchased products contaminated with benzene and submitted an expert opinion that "even benzene

at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene"); *Henning v. Luxury Brand Partners, LLC*, 2023 WL 3555998, at *3 (N.D. Cal. May 11, 2023) ("Plaintiff plausibly alleged the risk of benzene and that she would not have purchased the Products had she known about the risk. This is sufficient to plead standing based on economic injury.").

Citing the CCPA, Defendants claim that their conduct cannot possibly be harmful because "CVS's engagement with QM reflects the increasingly routine practice amongst businesses to retain third-party service providers to assist with consumer data—such that California has enacted legislation that permits, and even endorses, these contractual relationships between companies and third-party technology providers." MTD at 16:8-11. As an initial matter, even if the CCPA permitted Defendants' conduct (it does not) while the CIPA prohibitted it, the CIPA must control, as the "CCPA explicitly states that 'in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control.'" *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024) (citing Cal. Civ. Code § 1798.175).

Regardless, as this Court has held, enabling an undisclosed third-party service provider to acquire personal information without consent is equally violative of the CCPA. *See*, *e.g.*, *M.G. v. Therapymatch, Inc.*, 2024 WL 4219992, at *1, *7 (N.D. Cal. Sept. 16, 2024) (Martínez-Olguín, J.) (sustaining CCPA claim where "Headway embeds Google Analytics code on its website, which allows Google to intercept and collect Headway website users' protected mental health information"); *Shah v. Capital One Financial Corp.*, --- F. Supp. 3d ---, 2025 WL 714252, at *8 (N.D. Cal. Mar. 3, 2025) (sustaining CCPA claim where "Plaintiffs allege that Defendant allowed third parties to embed trackers, such as Google and Microsoft, on its website and that these trackers transmitted Plaintiffs' personal information"). And it is hard to fathom that California law would condone behavior that the HHS did not. Specifically, HHS issued guidance stating that "HIPAA-covered entities, such as Defendants" were "not permitted to use tracking technologies [including "session replay scripts" like QM] in a manner that would result in impermissible disclosures of PHI to tracking technology vendors." Compl. ¶¶ 60-61. HHS's reasoning for this was that "[s]uch disclosures can reveal incredibly sensitive information about an individual, including diagnoses,

frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment." *Id.* ¶ 62. "This is the exact situation here, where QM—as enabled by [Defendants]—intercepts a user's full name, e-mail address, and phone number, alongside their medication and vaccination history." *Id.* ¶ 64.

Defendants' citations to *Antman v. Uber Techs.*, Inc., 2018 WL 2151231 (N.D. Cal. May 10, 2018), and *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220 (N.D. Cal. 2022), are unpersuasive. *See* MTD at 15:24-16:1. Those were "data breach case[s]" and did not involve the same imminent harm (the loss of control of one's personal information) as here. *See James*, 701 F. Supp. 3d at 951. Instead, in those cases, the plaintiffs' theory of injury was "fraud or identity theft." *Antman*, 2018 WL 2151231, at *1; *Greenstein*, 585 F. Supp. 3d at 1228. Thus, Defendants' citations are inapposite.

In sum, the Article III harm Plaintiffs suffered here and that the CIPA protects against is the loss of control of their personal medical information (as exacerbated by the risk of future harm that Defendants' employment of QM exposed Plaintiffs to). With the harm Plaintiffs are seeking to remedy clarified, the remainder of Defendants' arguments can be easily disposed of.

## III. QM IS A THIRD-PARTY EAVESDROPPER

Defendants note that "[i]n order to trigger the protections of CIPA, there must be a third-party that allegedly eavesdropped upon or recorded the communication." MTD at 15:3-4. Defendants then argue there can be no CIPA liability—and thus, no Article III standing—"because QM was contractually limited in any use of PHI for its own purpose, [and thus] acting as a mere extension of CVS—not a third-party." MTD at 15:10-12. This is wrong.

### A. CIPA § 632 Does Not Require The Presence Of A Third Party

For starters, Defendants appear to discuss only the elements of Plaintiffs' CIPA § 631 claim. However, Plaintiffs also assert a CIPA § 632 claim. *See* Compl. ¶¶ 87-96. And "Section 632 makes it illegal to either eavesdrop upon or record confidential communications. The third party doctrine applies to eavesdropping, but not recording." *Turner*, 735 F. Supp. 3d at 1182 n.4; *see also Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 117 (2006) ("[T]he terms of section 632 … do[] not absolutely preclude a party to a telephone conversation from recording the conversation, but rather

simply prohibit[] such a party from secretly or surreptitiously recording the conversation."). So, Defendants can be liable if they violated CIPA § 632 by using QM's service to record Plaintiffs' private medical communications, even if there was no third party present.

### B. QM Is A Third-Party Eavesdropper Under The "Capability" Test, Which This Court Adopted In *Cody*

In any event, Defendants cite the wrong (or at least, an outdated) analysis of whether a software-as-a-service ("SaaS") provider is a third party for purposes of the CIPA. Specifically, this Court has rejected Defendants' "extension" approach to this question "because it adds requirements about the intentions and usage of the prospective third party that are not present in Section 631's second clause, and it would make the third clause (penalizing use) superfluous." *Cody*, 718 F. Supp. 3d at 1001 (cleaned up). Instead, this Court held "a vendor hired by a website may act as a third-party eavesdropper if it secretly records conversations in real time." *Id*. (citing *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

In doing so, the Court adopted the "capability" approach to addressing whether a SaaS provider is a third party, joining a "growing number of district courts" to do the same. *Turner*, 735 F. Supp. 3d 1169, 1184 (N.D. Cal. 2024) (collecting cases adopting the "capability" approach and doing the same); *see also*, *e.g.*, *Yockey*, 688 F. Supp. 3d at 972-73; *Balletto v. Am. Honda Motor Co.*, 2024 WL 589090, at *3 (N.D. Cal. Feb. 13, 2024); *Ambriz v. Google, LLC*, 2025 WL 830450, at *3 (N.D. Cal. Feb. 10, 2025); *Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *7 (C.D. Cal. Nov. 27, 2023); *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 854 (W.D. Wash. 2024); Tate v. VITAS Healthcare Corp., 762 F. Supp. 3d 949, 955 (E.D. Cal. 2025).

Under the "capability" analysis, courts have had no trouble finding QM is a third party because it "captures, stores, and interprets [] real-time data—which extends beyond the ordinary function of a tape recorder." *Yoon*, 549 F. Supp. 3d at 1081 (finding QM was a third party); *see also Wright v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2023 WL 5837492, at *6 (S.D. Cal. Sept. 8, 2023) (same based on "allegations that Quantum retains the right to analyze and distribute recorded communications for independent purposes"); *Javier*, 649 F. Supp. 3d at 900 (SaaS provider was a third party where "Javier pleads that ActiveProspect monitors, analyzes, and stores information about

visits to Assurance's websites"). Plaintiffs' allegations meet this standard, as Plaintiffs allege QM had the capability to use the wiretapped conversations for a number of purposes other than simply providing them to Defendants, including but not limited to:

- "[C]aptur[ing] behavioral indicators, conversion data points, API performance, and more." Compl. ¶ 36.
- Providing "analytics, including behavioral metrics, technical metrics, and business metrics." *Id.* ¶ 37.
- Providing an AI that "automatically summarize[s] the thousands of data points collected in a user session and consolidates the session timeline into a short, readable summary." *Id.* ¶ 40.
- Integrating and sharing information with even further third parties, such as "Google Analytics, Adobe Analytics, Salesforce, AppDynamics, and more." *Id.* ¶¶ 41-42.

### C. The Business Association Agreement Does Not Make QM Any Less Of A Third Party Eavesdropper, And In Fact, Supports That QM Is One

Defendants' citation to its Business Association Agreement ("BAA") with QM does not change this analysis. *First*, although Defendants include the BAA, it is notably Exhibit E to a presumably much longer agreement between Defendants and QM. *See* Bowe Decl. Ex. A. And the BAA references the general services agreement as modifying or delineating the scope of the BAA. *See* Bowe Decl. Ex. A at ¶ 4(a) ("Business Associate may use and disclose PHI as necessary to provide its services *as described in the Services Agreement*.") (emphasis added). Thus, to the extent the Court considers materials outside the pleadings at this stage (and it should not), Defendants should be required to produce the entirety of the agreement with QM. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time.").

*Second*, the BAA has no bearing on whether QM is a third party. In *Tate*, 762 F. Supp. 3d at 956, the defendant made a virtually identical argument, "point[ing] to a 'Business Association Agreement,' which it state[d] preclude[d] [the SaaS provider] from utilizing any data obtained for its own purposes." The *Tate* court rejected this argument, finding the SaaS company "already

allegedly violated the caller's privacy" through is surreptitious recording, and "whether [it] actually use[d] the contents of the call for its own purposes [was] not legally relevant." *Id.* In fact, the existence of a BAA that ostensibly prohibits QM "from using or disclosing … information for its own purpose without the explicit written permission of CVS" (MTD at 3:15-16) "creates a plausible inference that [QM] has the technological capability to use the data it collects and analyzes, regardless of whether it actually makes use of that data." *Ambriz*, 2025 WL 830450, at *3. "After all, it would be illogical for" Defendants to prohibit QM from doing "something it is not capable of doing." *Id.*

*Third*, if anything, the BAA cements that QM is a third-party eavesdropper who intercepted Plaintiffs' private medical information. As the BAA states, QM "may use and disclose PHI as necessary to provide its services," and may even "de-identify PHI … as necessary to provide its services." Bowe Decl. Ex. A at ¶¶ 4(a)-4(b). This suggests that Defendants have permitted QM to receive PHI and disclose it to even further third parties such as "Google Analytics, Adobe Analytics, Salesforce, AppDynamics, and more" to provide the various services Plaintiffs allege. Compl. ¶¶ 35-42. Moreover, the BAA permits QM to use "de-identified information for its own purpose with[] the explicit written permission of CVS" (Bowe Decl. Ex. A at ¶ 4(b)), which is consistent with the HIPAA. *See* 45 C.F.R. § 164.504(e)(2)(i)(A) ("The contract may permit the business associate to use and disclose protected health information for the proper management and administration of the business associate."). And again, the existence of such a provision "creates a plausible inference that [QM] has the technological capability to use the data it collects and analyzes," or else, why include a provision requiring QM to procure consent for "something it is not capable of doing." *Ambriz*, 2025 WL 830450, at *3. Last, it is important to reiterate that HHS prohibited HIPAA-covered entities like Defendants from using "session replay scripts" "in a manner that would result in impermissible disclosures of PHI to tracking technology vendors," even though presumably every such entity would also have a BAA. Compl. ¶ 61.

In short, the fact that QM has a BAA with Defendants does not mean QM is not a third-party eavesdropper. Instead, it cements QM is a "separate and distinct third-party entity" that is itself "eavesdrop[ping] upon, record[ing], extract[ing] data from, and analyz[ing] a conversation to which

it was not a party" (Compl. ¶ 44), that QM has the capability to use de-anonymized private health information for its own purposes, and that it is doing all this with the agreement of Defendants.

## IV. DEFENDANTS HAVE NOT MET THEIR BURDEN TO SHOW PLAINTIFFS CONSENTED TO QM'S WIRETAPPING

Defendants argue that "Plaintiffs could not possibly have suffered any injury from conduct that they were aware of and to which they consented." MTD at 14:27-28. "[C]onsent is an affirmative defense for which [D]efendant[s] bear[] the burden of proof." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024); *see also Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 n.13 (N.D. Cal. 2023) ("[C]onsent is a defense to plaintiffs' claims and it is therefore on [defendants], not plaintiffs, to prove.") (cleaned up); *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021) ("The party seeking to establish consent has the burden of proof."). Defendant cannot meet this burden here.

### A. Defendants Have Not Shown That Plaintiffs Were On Notice Of Or Assented To The Privacy Policy

Defendants argue Plaintiffs consented to QM's eavesdropping because "in order to create their CVS.com Accounts, Plaintiffs were presented with the Terms of Use and Privacy Policy." MTD at 13:22-23. As this Court has held, "merely having a privacy policy online" is insufficient "to show consent under CIPA." *Cody*, 718 F. Supp. 3d at 1000. Instead, as with any hyperlinked document, Defendants must demonstrate users were *on notice of and assented to* that Privacy Policy. *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1358 (S.D. Cal. 2024) ("Where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.") (cleaned up); *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1197 (S.D. Cal. 2024) ("Privacy policies, however, do not bind users 'where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent.'") (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1778-79 (9th Cir. 2014)). Defendants cannot demonstrate Plaintiffs were on constructive notice of or assented to the Privacy Policy here.

#### *1. Defendants Have Not Submitted The Design And Content Of The Webform Plaintiffs Actually Saw When They Created Their CVS Accounts*

As an initial matter, Defendants only provide "a form that is *similar to* the webform that [Plaintiffs] would have populated" to create their CVS accounts and where the hyperlink to the Privacy Policy appeared. Bowe Decl. ¶ 11; *see also id.* Ex. B. In other words, Defendants have not supplied the design and content of the *exact* webform Plaintiffs saw when they created their CVS accounts. And "similar" is an ambiguous term, and it is unclear what elements of Plaintiffs' experience were "similar" to the page Defendants present, or how or whether the webpages were "similar" in all material respects. Absent evidence of what Defendants' webform actually looked like when Plaintiffs created their CVS accounts, Defendants' notice argument must fail. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) (finding lack of notice of updated terms of use where "Amazon did not provide the court with a copy or description of any such notice"). Defendants are not permitted to introduce this evidence on reply. *See*, *e.g.*, *Mort v. DeJoy*, 2023 WL 168834, at *2 (E.D. Cal. Jan. 12, 2023) ("The Court will not consider evidence or arguments submitted for the first time with a party's reply brief because it deprives the opposing the opportunity to respond.").

#### *2. The Design And Content Of Defendants' Webform Was Insufficient To Put Plaintiffs On Notice Of The Consent To The Privacy Policy*

Even assuming that Exhibit B to the Bowe Declaration is the same as what Plaintiffs saw when they created their CVS accounts (and the Court should not presume this), the design and content of the page is still insufficient to put Plaintiffs on constructive notice of the Privacy Policy. Defendants' account creation webpage looked like this:

//

//

//

//

//




Bowe Decl. Ex. B. The advisal of consent to the Privacy Policy has all the hallmarks of inconspicuousness that render it insufficient for notice. *First*, the Privacy Policy is not actually hyperlinked in the advisal language. And regardless, it is in the same small, gray font as the surrounding text. *See, e.g.*, *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 854 (9th Cir. 2022) (notice insufficient where it "appeared in the same gray font as the rest of the sentence");

*Godun v. JustAnswer LLC*, 135 F.4th 699, 712 (9th Cir. 2025) (same where "the advisal text is the same color as other text on the page"); *Gill v. Chipotle Mexican Grill, Inc.*, 2025 WL 287320, at *4 (C.D. Cal. Jan. 23, 2025) (same where the notice was "in the same or very similar shade of brown typeface as the rest of the surrounding text, making it not sufficiently clear").

*Second*, the advisal language is buried in a multi-line paragraph that discusses subscribing to "marketing emails about CVS Pharmacy offers, new products, health information and more." Bowe Decl. Ex. B. This poses several separate problems. The paragraph separates the advisal from the action button, rendering it not "directly above or below the action button" *Godun*, 135 F.4th at 712. The lengthy paragraphs buries also any of the consent language to the Privacy Policy. *See*, *e.g.*, *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *10 (N.D. Cal. July 31, 2023) (notice insufficient where it was "buried in six lines of text and is located five lines away from the 'Agree and Subscribe' button"); *Burzdak v. Universal Screen Arts, Inc.*, 2021 WL 3621830, at *6 (N.D. Cal. Aug. 16, 2021) (same where the advisal was "buried in a relatively lengthy paragraph"); *Morrison v. Yippee Ent., Inc.*, 756 F. Supp. 3d 842, 850 (S.D. Cal. 2024) (same where although advisal was "located near the 'Start Subscription' button, it is within an eight-line paragraph, all in font smaller than that on the page generally").

Further, the paragraph concerns subscribing to marketing e-mails, rather than the surreptitiuous collection of information by third parties. This leaves users with the impression that, even if they had notice of the consent to the Privacy Policy (and they do not), "they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information." *Herzog. v. Super. Ct.*, 101 Cal. App. 5th 1280, 1298 (2024); *see also Seneca v. Homeaglow Inc.*, 2024 WL 750029, at *4 (C.D. Cal. Feb. 7, 2024), *aff'd*, 2025 WL 852896 (9th Cir. Mar. 19, 2025) (finding no notice where advisal was contained "in the body of [a] paragraph" whose "only conditions … address[ed] consent to contact from Homeaglow and the selected cleaner regarding the customer's booking"); *Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1357 (S.D. Fla. 2024) (same where extraneous text "suggest[s] to a user that once they subscribe and read the language underneath the subscription buttons, the user has considered all relevant conditions to the subscription, and the subscription process is over");

*Burzdak*, 2021 WL 3621830, at *6 (same where paragraph "largely focuses on and promotes free shipping and the VIP Insider program").

*Third*, the advisal "is sandwiched between other larger elements" on a cluttered page that distracts from notice, including a checkbox to receive marketing e-mails from CVS, form fields to create an account, and "a considerably larger," red "Create your account" button. *Rocha v. Urban Outfitters, Inc.*, 2024 WL 393486, at *5 (N.D. Cal. Feb. 1, 2024) (Martínez-Olguín, J.); *see also Berman*, 30 F.4th at 854 (finding no notice where advisal was set "[b]etween the comparatively large box displaying the zip code and the large green 'continue' button [in] two lines of text in a tiny gray font," which "naturally direct[] the user's attention everywhere else"); *Sadlock*, 2023 WL 4869245, at *10 (same where "[t]here are a number of other elements on the screen that distract from the reference to the Subscriber Agreement"); *Morrison*, 756 F. Supp. 3d at 850 (same where "the page contains promotional material displaying emoticon illustrations and self-promotional statements, which draw a viewer's attention away from the hyperlink").

*Finally*, fact Plaintiffs may have contemplated an ongoing relationship with Defendants is of no moment. "[T]he Court must still analyze the hyperlink's visual placement to determine whether it is sufficiently conspicuous to put a 'reasonably prudent' user on notice." *Morrison*, 756 F. Supp. 3d at 850 (citing *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024)). Relatedly, "[r]epeated use of a website or mobile application does not contribute to constructive notice because users are no more likely to stumble upon inconspicuous hyperlinks on their hundredth or thousandth visit than they are on their first." *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117, 119-20 (9th Cir. 2020).

Thus, a reasonably conspicuous user would *not* be on notice of the language that "[b]y creatining an account, [they] agree to the CVS Pharmacy ... Privacy Policy." And without notice, there can be no consent to the wiretapping.

#### 3. *There Was No Unambiguous Manifestation Of Assent To The Privacy Policy Hyperlink*

The fact there is a red hyperlink to the Privacy Policy does not cure the lack of notice. *See* MTD at 7:18-19 ("The Terms of Use and Privacy Policy are both available at the hyperlinks reflected

in red above, providing Plaintiffs with the opportunity to review both documents."). As an initial matter, there is still no reasonably conpsicuous notice of this hyperlink because it still appears on a cluttered page with more distracting elements, it is not "directly above or below the action button[,] and is displayed in relatively small text." *Godun*, 135 F.4th at 712. And "[u]sing a different color for the hyperlink from the surrounding text, by itself, is not sufficient to render the hyperlink reasonably conspicuous." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873 (N.D. Ill. 2020); *see also Colgate v. JUUL Labs, Inc., 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019).* ("I am not convinced that the mere change in color of the hyperlinks, without more, is enough.").

But more important, there is no language (or at least, no notice of any language) stating what action a user must take to agree to the Privacy Policy: the hyperlink simply appears on its own. *See Godun*, 135 F.4th at 712 ("The advisal lacked an explanatory phrase indicating that 'By clicking connect now' or 'By connecting,' or 'By chatting,' etc., she agreed to the terms."); *Berman*, 30 F.4th at 858 ("The notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here."). And even where an app developer "makes its terms of use available via a conspicuous hyperlink … but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

*4. The "Terms Within Terms" Approach To The Privacy Policy Is Insufficient For Notice*

Even if Plaintiffs were on notice of the Privacy Policy and languaging indicating agreement to the Privacy Policy, and unambiguously manifested assent to the same (and they were not), that is still insufficient for notice. This is so because, as Defendants admit, the Privacy Policy directed consumers to "visit the hyperlinked CVS Privacy Center to review service-specific privacy disclosures, such as the CVS Pharmacy Notice of Privacy Practices." MTD at 9:19-23. In other words, to understand the scope of information being collected, consumers had to visit a *separate* privacy policy from the main one they were ostensibly agreeing to. Courts have found that such a

"terms within terms" or "Russian nesting doll" approach is insufficient for notice. *See Ajzenman v. Off. of Comm'r of Baseball*, 492 F. Supp. 3d 1067, 1078 (C.D. Cal. 2020) (refusing to enforce terms where "a user … had to navigate to different websites in order to find the terms, and had to complete a multi-step process of clicking non-obvious links"); *Ramirez v. Trusper, Inc.*, 2024 WL 4479862, at *6 (N.D. Cal. Oct. 11, 2024) (refusing to enforce terms because the "the multi-step process an internet user must endure to reach the 'terms page' hyperlink further minimizes the chance that they will receive notice of the terms of the Participation Agreement"). Simply put: "It stretches credulity to assert that the actual page that is linked to the application [Plaintiffs] filled out does not govern that application, but rather another page linked to the page that is linked to the application does." *McGhee v. N. Am. Bancard, LLC*, 2017 WL 3118799, at *4 (S.D. Cal. July 21, 2017), *aff'd*, 755 F. App'x 718 (9th Cir. 2019). For this reason too, there is no notice of the *actual* Privacy Policy ostensibly disclosing the collection of Plaintiffs' private medical information.

*5. The App Store And Menu Disclosures Are Insufficient*

Defendants also argue that "a user has the opportunity to review the types of data that CVS, as the app developer, may share with third-parties" on the App Store page and in the App's "menu bar." *See* MTD at 4:14, 10:9-11. Defendants do not argue that a user is put on reasonably conspicuous notice of these disclosures. And "opportunity" is not the same as being required to agree to such practices. "Reasonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, not merely see them." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025). Indeed, Defendants do not argue that users were required in any way to view and/or agree to any disclosures on the App Store page or in the menu bar of the App, which is insufficient for notice or consent. *See also Cody*, 718 F. Supp. 3d at 1000 ("merely having a privacy policy online" is insufficient "to show consent under CIPA").

* * *

To put all this succinctly, even if the hyperlink to the Privacy Policy was conspicuous (and it was not), there is no conspicuous language stating what action a user must take to agree to it. The advisal language regarding agreement to the Privacy Policy is also not reasonably conspicuous. And the "terms within terms" approach to the Privacy Policy is not reasonably conspicuous. Thus, there

is no notice of the Privacy Policy, no notice of any language ostensibly agreeing to the Privacy Policy, and no unambiguous manifestation of assent to the Privacy Policy. For each of these reasons, Plaintiffs did not consent to the Privacy Policy, meaning there was no consent to the wiretapping.

### B. The Privacy Policy Does Not Disclose The Wiretapping, And In Fact, Could Give Reasonable Users The Opposite Impression

Even if Plaintiffs were on notice of and assented to the Privacy Policy (and they did not), the Privacy Policy does not disclose QM's wiretapping. In fact, a reasonable Internet user may come away from the Privacy Policy with the opposite impression.

The question of consent is whether "a reasonable user would [] necessarily understand that they were consenting to the data collection at issue." *Calhoun*, 113 F.4th at 1150. If that user could have plausibly understood the disclosures as not disclosing that the defendant would engage in particular conduct, then the disclosures are insufficient to establish consent." *Id.* at 1147 (cleaned up); *see also McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("At the motion to dismiss stage, the Court is not prepared to rule that the Privacy Policy establishes an absolute bar to Plaintiff's claims.").

Here, there are at least several grounds as to why there is at least "is a factual dispute over whether the [Privacy Policy] sufficiently notified Plaintiffs of [Defendants'] conduct." *Turner*, 735 F. Supp. 3d at 1181. In particular, in Section E of "Your California Privacy Rights" (*see* Bowe Decl. Ex. F at 7), Defendants have a table describing "[w]hat personal information we share and who we share personal information with." The table lists at least three salient categories: "sensitive personal information," miscellaneous information "protected under California or federal law," and other personal information covered by Cal. Civ. Code § 1798.80(e). Medical information is, of course, sensitive, protected under both federal law (by the HIPAA) and California law (by statutes such as the CCPA and CMIA), and full "name" and "medical information" are covered by Cal. Civ. Code § 1798.80(e). Defendants state they disclose this information to "[s]ubsidiaries and affiliates"[1] and

[1] "Affiliate" is a term of art meaning "any company that controls, is controlled by, or is under common control with another company." 16 C.F.R. § 313.3(a). QM is not controlled by Defendants.

"government entities." Bowe Decl. Ex. F at 7. But notably, Defendants state they *do not* share this information with third parties:

| Category of Personal Information | Category of third parties to whom we disclosed personal information | Category of third parties to whom we "Sold" or "Shared" personal information |
|---|---|---|
| Other personal information not listed above and described in California Civil Code § 1798.80(e) | • Subsidiaries and affiliates<br>• Government entities, regulators and law enforcement | N/A |
| Sensitive personal information | • Government entities, regulators and law enforcement | N/A |
| Information not listed above and related to characteristics protected under California or federal law | • Subsidiaries and affiliates<br>• Government entities, regulators and law enforcement | N/A |

Bowe Decl. Ex. F at 7. Yet, Plaintiffs' investigation shows this information—full names and medical information—*is shared* with a third party: QM. Compl. ¶¶ 50-55. Thus, the "the explicit statements in the [CVS] Privacy Notice would actually give a reasonable user the *opposite* impression regarding [Defendants'] data collection practices." *Calhoun*, 113 F.4th at 1148 (emphasis added).

Further, Defendants' separate privacy notice for CVS Pharmacy does state that "business associates" may be allowed to "access" PHI. Bowe Decl. Ex. I at 3. Defendants do not define a what a "business associate" is, but the only examples Defendants give are "third parties who perform billing or consulting services." *Id.* QM performs none of those: it is a large technology company who performs marketing and analytics services. Compl. ¶¶ 35-44. To put it simply, a reasonable user may understand "business associate" to mean entities that provide services similar to "billing" or "consulting"—which QM does not—and thus, only glean that their PHI is shared for the purposes of such services, rather than why QM actually receives it. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[A] word is given more precise content by the neighboring words with which it is associated.") (cleaned up); *cf. Yockey*, 688 F. Supp. 3d at 978 (finding no consent where "[p]ersonal information is not synonymous with a word-for-word transcript of all communications both as a matter of common sense and as defined by the policy") (cleaned up).

In short, the language of the Privacy Policy does not unambiguously and "explicitly notify users of the conduct at issue." *Calhoun*, 113 F.4th at 1147 (cleaned up). Instead, it may leave reasonable users with the opposite conclusion (*i.e.*, that no eavesdropping is occurring). This is insufficient for consent.

**C. Any Updated Terms Do Not Apply Absent Reasonably Conspicuous Notice And Assent To The Same**

As a final note, Defendants argue that updated terms may "apply in this proceeding or any other dispute resolution process." MTD at 8 n.2. For the purposes of this Motion, it does not appear that these updated terms materially affect Defendants' arguments, if at all. And, of course, Defendants cannot cure their violations of the CIPA retroactively. *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) ("[W]e conclude that the California Supreme Court would interpret Section 631(a) to require the prior consent of all parties to a communication."); *Kearney*, 39 Cal. 4th at 118 (CIPA § 632 prohibits "recording the conversation without first informing all parties to the conversation that the conversation is being recorded").

In any event, updated terms do not automatically apply. Instead, Defendants still must demonstrate users were on notice of and assented to the updated terms. "It is not sufficient to provide a general notice of the possibility of future modifications." *Jackson*, 65 F.4th at 1101. And "it is similarly unreasonable to require an employee or independent contractor [or consumer] to monitor his [or her] contract constantly for any changes." *Id.*; *see also Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) ("Stover had no obligation to investigate whether Experian issued new terms without providing notice to her that it had done so. Indeed, the opposite rule would lead to absurd results."); *Douglas v. United States District Court for the Central District of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) (finding no notice of updated terms on website where even if the plaintiff had visited the website where the new contract was posted, "he would have had no reason to look at the contract posted there," because "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side").

So, absent proof of notice of or assent to the updated terms (and it is Defendants' burden to prove), the updated terms do not apply to this case.

## V. PLAINTIFFS' CONTINUED USE OF A PHARMACEUTICAL APP DOES NOT PRECLUDE A FINDING OF CONCRETE HARM

Defendants argue "it is not reasonable for Plaintiffs to contend that their alleged interactions with the CVS App subjected them to privacy harms, given [] their continued use of it after filing the Action." MTD at 12:25-27. As noted above, CIPA requires prior consent, meaning no amount of continued use can cure Plaintiffs' earlier harms. *Javier*, 2022 WL 1744107, at *2; *Kearney*, 39 Cal. 4th at 118. This is because "case law underscores the principle that the privacy injury occurs at the point of interception without consent." *Frasco*, 2025 WL 1433825, at *11.

Still, Plaintiffs' continued use of the App does not mean they suffered no harm previously. The App in question is used for pharmaceutical and medical purposes. Courts have held continued use of a website or app after discovering unauthorized surveillance does not preclude standing in far more innocuous circumstances. *Rodriguez v. Google LLC*, 2024 WL 38302, at *7 (N.D. Cal. Jan. 3, 2024) (finding plaintiffs "need not show they unilaterally stopped using Google's services after learning about sWAA's alleged privacy violations to be able to aver they suffered harm"); *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 589 (N.D. Cal. 2015) (Koh, J.) (rejecting similar argument where defendant argued that "in order to avoid 'consenting' to Yahoo's conduct, stopped emailing Yahoo subscribers after discovering Yahoo's alleged wrongful conduct"). There is no reason to place "an undue burden on Plaintiffs" with filling prescriptions and other medical services to allege harm. *Rodrigez*, 2024 WL 38302, at *7.

Even if this Court were to consider Defendants' argument (it should not), "continued use" is "only [one] element[] of the fact-intensive inquiry for the 'offensiveness' of the privacy invasion that requires examining 'all of the surrounding circumstances.'" *Lopez*, 519 F. Supp. 3d at 691 (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 295 (2009)).[2] Plaintiffs haver still shown "reasonable expectation [of privacy] prior to" this lawsuit, especially "based on [Defendants'] own privacy policy" (to the extent there was notice, which there was not). *Lopez*, 519 F. Supp. 3d at 691; *see also*

[2] As noted above, Plaintiffs dispute that Article III standing for violation of the CIPA requires a showing of "highly offensive" conduct. Argument § II, *supra*; *see also James*, 701 F. Supp. 3d at 949 ("[T]he Court rejects Disney's argument that Plaintiffs must show that any interception of information was highly offensive in order to have standing."). Nonetheless, Plaintiffs have alleged that here.

Argument § IV.B., *supra*; *Yockey*, 688 F. Supp. 3d at 974 (finding "reasonable expectation of privacy" in health-related communications). And QM's surveillance of health-related information—as employed by Defendants—was so highly offensive that even HHS prohibited it. Compl. ¶¶ 60-63. Accordingly, Plaintiffs' continued use of the App is "not dispositive." *Lopez*, 519 F. Supp. 3d at 691.

None of Defendants' case law supports its argument. In *Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 847-48 (S.D. Cal. 2024), the court solely focused on standing to seek injunctive relief. The court did not find the plaintiff had no standing to for damages. *See Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019) ("[C]ourts have an independent obligation to police their own subject matter jurisdiction, including the parties' standing.") (cleaned up). And even as to injunctive relief, decisions from this District are more persuasive, as they acknowledge the "undue burden on everyday users." *Rodriguez*, 2024 WL 38302, at *5. And *Mikulsky* did not involve medical information, unlike here.

*Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 9, 26 (1994), involved a claim under the California Constitution (rather than the CIPA), which requires a showing of "highly offensive" conduct. Regardless, the plaintiffs in that case were "[u]nlike the general population" because they were "student athletes [who] undergo frequent physical examinations, reveal their bodily and medical conditions to coaches and trainers, and often dress and undress in same-sex locker rooms," and thus "normally and reasonably forgo a measure of their privacy in exchange for the personal and professional benefits of extracurricular athletics." *Id.* at 9.

Last, *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1028, 1035 (N.D. Cal. 2014) concerned communications sent over an employer-owned and issued cell phone. The court found "[t]he possibility that [defendant employer] may have reviewed text messages sent to a cell phone which it owned and controlled—without more—is insufficient to establish an offensive use." *Id.* at 1036. But here, Plaintiffs allege a *third party* surveilled Plaintiffs' communications, which Plaintiffs reasonably expected to keep private (*i.e.*, between, at best, Plaintiffs and Defendants). *See Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 932 (N.D. Cal. 2024) ("Perhaps Plaintiffs should expect to reveal their IP addresses to the gamespot.com website … But that does not necessarily mean that Plaintiffs

should reasonably expect to have Trackers installed that send their IP addresses to third parties every time Plaintiffs visit gamespot.com."); *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 953 (N.D. Cal. 2024) ("Plaintiffs have alleged that the intended recipient of communications concerning medical conditions, insurance information, and prescription history, are Plaintiffs' doctors and pharmacists, respectively—not Salesforce.") (cleaned up); *see also* Compl. ¶¶ 93-94.

Accordingly, Plaintiffs' continued use of the App does not deprive them of standing for past conduct, which occurred "at the point of interception without consent." *Frasco*, 2025 WL 1433825, at *11.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety. If the Court determines that the pleadings are deficient in any respect, Plaintiffs respectfully request leave to amend to cure any such deficiencies. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: May 29, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Ines Diaz Villafana*
Ines Diaz Villafana

L. Timothy Fisher (State Bar No. 191626)
Ines Diaz Villafana (State Bar. No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
idiaz@bursor.com

*Attorneys for Plaintiffs*